UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| MARY LYNN NEWCOMB, | ) | |
|        Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:03-cv-1814 SEB-VSS |
| | ) | |
| THORP AWNINGS, INC. d/b/a QUIGLEY | ) | |
| MANUFACTURING, | ) | |
|        Defendant. | ) | |

<u>ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

This is an employment discrimination case brought pursuant to the Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000 *et. seq.*[1]  The plaintiff, Mary Lynn Newcomb

("Newcomb"), alleges that her employer, Thorp Awnings, Inc. d/b/a Quigley

Manufacturing ("Thorp")[2], discriminated against her on the basis of her sex when it

restructured her job responsibilities and thereafter terminated her employment.

The case is before us on Thorp's motion for summary judgment, which, for the

following reasons, we <u>GRANT</u>.

_____

[1]Plaintiff has abandoned Count II of her Complaint, brought pursuant to the Age
Discrimination in Employment Act, 29 U.S.C. § 621 *et. seq.*  Pl.'s Response Br., fn. 1.

[2]Defendant points out that it is misidentified in the caption of this cause of action.  The
company is actually Quigley Manufacturing, Inc. d/b/a Thorp Awnings.  Def.'s Br. at 1.

<u>Statement of Facts</u>

The following facts are either unrebutted or interpreted in a light reasonably most favorable to the plaintiff.  All are supported by admissible evidence.

In 1990, Newcomb moved from Chicago to Indianapolis to take a sales job with Thorp, a company owned by her stepfather, William Sommer ("Sommer").  Thorp manufactures, markets and installs fabric awnings for homes and businesses.  At the time Newcomb joined the company, all salespersons had the opportunity to sell both residential and commercial accounts.  The sales seasons for these two types of business differ slightly; the residential part of the awning business tends to be more seasonal, with greater volume in the spring and summer months, while commercial sales occur year-round.  Quigley Dep. 22.  Newcomb, though a full-time sales person, usually did not work the months of December and January and her commissions were spread out throughout the year.

In July 1998, Daniel Quigley ("Quigley"), a Thorp sales person, bought the company from Sommers.  Quigley Dep. p. 16.  At the time of this transfer, Newcomb and Quigley discussed her continued employment with Thorp, during which conversation she told Quigley that she had five-year plan and planned to work full-time until her children were finished with school, and then, hopefully, she would move to a part-time job.  Newcomb Dep. p. 14.  As it happened, five years later, Newcomb was no longer a Thorp employee, and the reason(s) for her termination is the one of the subjects of this lawsuit.  During the two years preceding her termination in 2003, Newcomb's job duties were

2

restructured twice, and these changes are also at issue in the lawsuit.

*Job Reassignments*

The first change in Newcomb's job responsibilities occurred in February 2001 when Greg Cantrell ("Cantrell"), a Thorp awning installer, joined the sales force. As noted previously, Thorp sales people generally worked both commercial and residential accounts but when Cantrell moved to sales, Quigley assigned him the commercial accounts and made Newcomb responsible for residential sales only. Newcomb objected to the shift in sales responsibilities although she ultimately acquiesced in the change. Quigley explained the restructuring by citing Cantrell's expertise with commercial awnings and Newcomb's forté in residential sales based on her good rapport with homemakers and residential customers. When Newcomb told Quigley she thought the job shift was unfair, Quigley allegedly replied: "Well, he [Cantrell] doesn't like to compete with a woman." Newcomb Dep. pp. 11, 67, 71.

The terms of employment were memorialized in her 2001 sales agreement and state, in pertinent part[3]:

> Ms. Newcomb will be responsible for all residential awnings
> sales for Thorp Awnings 2001. All Residential sales calls
> will be given to Mary Lynn . . . 15% commission will be paid
> for 2001 residential sales over $310,000. . . . No commission
> will be paid on commercial sales except for commercial
> properties that purchase retractable awnings. These sales will
> be booked as residential and applied to her commissions.
> Seven commercial accounts will be applied to Ms. Newcombs

---

[3]Pl.'s Exhibit 1, 2001 Sales Agreement (February 1, 2001).

3

> [*sic*] commission at 10% [*list omitted*].  I agree to the propsal
> [*sic*] and feel that they are fair to Thorp Awnings and Ms.
> Newcomb. /signed Dan Quigley.

In accordance with the above plan, Newcomb worked exclusively in residential sales until her job duties were restructured a second time in January 2003.  In the meantime, a former employee, Kevin Cranny ("Cranny"), joined the sales force in January 2002 and Cantrell left shortly thereafter to start his own awning business.  Cranny essentially took Cantrell's place as the sales person in charge of commercial accounts.  Def.'s Br. at 4; Cranny Dep. p. 16; Quigley Dep. p. 50.

Thorp contends that poor performance was the reason Newcomb's selling duties were altered twice and there is no dispute that she had made measuring errors of which both Quigley and she were aware.  However, there is no documentary record of her allegedly "error prone" performance in 2001 and 2003 – nothing in her personnel file and nothing in her 2001 or 2003 sales agreements.[4]  Quigley claims he approached Newcomb approximately ten times a year in both 2001 and 2002 concerning measuring errors she had made on her jobs, as well as her inattention to detail and her ineffective manner in dealing with difficult customers.  Quigley Dep. pp. 58-61, 69, 74-75, 82.  In September 2001, Quigley sent Newcomb home for three (3) days because nine of her jobs had been "returned" for problems, costing the company money[5] and, according to Newcomb,

---

[4]Subsequent to Newcomb's termination, Quigley created a document detailing entitled "Mary Lynn Newcomb Incidents," a list of Plaintiff's 2002 measuring errors.  Pl.'s Ex. 3.

[5]Apparently, commercial awning jobs are typically more complicated and expensive than
(continued...)

4

Quigley felt he had to take some action because the "guys in the back" felt she was
receiving preferential treatment.  Newcomb Dep. p. 69.  Quigley recalls having been
"quite concerned" about Newcomb's error rate for longer than the period at issue in this
claim, to the point of his approaching Sommers to discuss her possible termination.
Sommers Dep. pp. 13-14.  Newcomb's co-worker, Cranny, claims he also received
complaints about Newcomb's deficiencies in customer service, as did Jeff Heath
("Heath"), the company's service manager, who made occasional awning sales in
conjunction with sales of Thorp's cleaning services.  Cranny Dep. pp. 16, 22;  Heath Dep.
pp. 24, 53.

The 2002 Sales Agreement, unlike that of the previous year, included a term that
referred to performance.  It was drafted by Plaintiff, and states:

> Any job which is brought back because Mary Lynn mismeasured or
> because Mary Lynn made an error on the initial order, commission will not
> be paid.  Provided that she is made aware of the situation and has the
> opportunity to go over the error with Dan Quigley and the responsible
> installer on that job.

Pl.'s Response Br. ¶ 9; Ex. 2 (2002 Sales Agreement).

In January 2003, Newcomb's full-time sales job was reduced to part-time.
Quigley characterized the job change as a "narrowing" of Newcomb's responsibilities
from all residential awning sales to residential retractable awning sales, Def.'s Br. p. 16,
while Newcomb referred to it as something more substantial; a "shock," because it

---

[5](...continued)
residential jobs.  Quigley Decl. ¶ 7.

changed her job "drastically."  Newcomb Dep. 83.  The greatest change was the curtailed selling period for retractable awnings: from March to September 15.  In addition, the commission on retractable awnings was lower – ten percent (10%) – whereas the residential awning commission was fifteen percent (15%).  Finally, Quigley encouraged Newcomb to work from home, though he did not require it.  Although she retained an office at Thorp, she began working mostly from home.  Quigley Dep. p. 97.  In spite of the job status change, Newcomb retained her car allowance, was promised the commissions for retractable awning sales made by the commercial salespeople, attended a training seminar in Arizona in February 2003, and was assigned an assistant to take phone calls and screen potential clients.  Newcomb Dep. pp. 84-87.

In a series of e-mail exchanges on January 20 and 21, 2003, Quigley responded to Newcomb's expressions of dismay at the job restructuring, explaining that: (1) he was not cutting her job in order to bring in other sales people; (2) he was calling the job "part-time" because she would have five (5) months off, but she was free to "spread it over 12 months"; (3) the reassignment to retractable sales "plays to [her] strenghts [sic]"; (4) the company was in financial straits and he would soon be "letting go 4 more people from the factory to get more lean," and (5) he would assign her a sales assistant to support her in the new position.  Pl.'s Ex. 7; Quigley Dep. p. 96.

Newcomb was surprised by the financial situation of the company, yet proposed that she receive "a draw of some sort in Feb[ruary] and part of March," based on her past sales record.  In addition, she queried Quigley about who would take over the non-

6

retractable residential awning sales, reminding him of the $37,456 of outstanding commissions due her for spring sales.  Pl.'s Ex 11.  She also asked: "why am I the only salesperson having the ability to sell being taken away?"  Pl.'s Ex. 8.  Quigley did not respond, though in the final email on January 21, 2003, he expanded on the financial situation of the company and explained that he would pick up the remaining residential sales, while the other two (2) men's jobs "will not be different than if you were here."  Pl.'s Ex. 9.

Newcomb asserts that Quigley knew that she did not wish to work part-time, based on their conversation two months earlier.  In  November 2002, Quigley allegedly visited Newcomb in her office, closed the door and said: "Well, I know ... that your husband makes good money and your kids are out of school and you could even get a part-time job at Thrapp Jewelers, I'm just wondering what you're going to do."  She responded, stating that she planned to stay on as a full-time salesperson and asked if there was a reason he did not want her to work there. Quigley allegedly said: "Well, no, there are some guys in the back jumping at the bit for you job, but you're doing a good job."  Newcomb Dep. pp. 10-11, 96.  Quigley disputes having made this statement.  Quigley Dep. p. 90.

*Termination*

Five months after her second job restructuring, Newcomb's employment was terminated, purportedly for stealing confidential office documents.  On the evening of May 1, 2003, unbeknownst to Quigley, Newcomb was in the Thorp office for a meeting with a potential client.   Newcomb Dep. p. 117.  The following morning, Quigley

discovered that a copy of a page from the "confidential" sales journal ("Journal") had been found lying under the photocopier.  He questioned the Thorp staff and, when no one admitted to having made the copy, called the alarm company to find out who had entered the office the night before.  According to the alarm company, Newcomb had locked up the office the night before, causing Quigley to conclude that it was she who had been copying the records.

The Journal contains the monthly sales of each of the salespeople and is kept in a closed, but not locked, cabinet behind the front desk.  The Journal also identifies each client by name, records the contract price for each sale, and tracks sales for the current year as compared with the previous year.  Def.'s Br. at 9.  Although there is no express policy prohibiting the copying or removal of the Journal information, Quigley considers the information valuable and confidential, and he was concerned that the information might have been destined for his competitors; indeed, coincidentally, Newcomb's step-brother is also in the awning business.  Quigley Dep. pp. 128-29, 133.

Once Quigley suspected Newcomb, he phoned her at home and was clearly upset.  He told her not to see her customers that day (Friday), not to come in over the weekend, and to meet him on Monday when they would address the issue of the photocopies.  In addition, Quigley told her she "was causing undue stress in the workplace" but, in that conversation, he did not accuse her of stealing confidential materials from the workplace.  Newcomb Dep. 13-32; Quigley Dep. p. 137-138.

Newcomb admits that she copied the sales reports for April in order to get an end-

8

of-month accounting of sales on May 1 and had copied the previous months' reports on

other occasions.  By comparing the Journal to her own records, for example, she found

that none of her April sales had been recorded.  Newcomb also testified that it never

occurred to her to seek Quigley's permission to copy the papers, because she "felt

trusted," had "access to the building for 13 years," and foremost, she believed she already

possessed  the "most confidential piece of equipment in Thorp Awnings, the price book

[...]."  Newcomb Dep. 118-122.

In their final meeting, on Monday, May 5, 2003, Quigley first gave Newcomb the

opportunity to quit and, when she declined, he stated that he was terminating her for

copying confidential documents and taking them home without express consent, which he

considered stealing.   Quigley Dep. p. 136-138.   The Thorp employee handbook includes

the following provision regarding termination:

> By the laws of the state of Indiana, a person can be fired by their employer
> for just about anything.  We try to be as fair as possible at Thorp but the
> following will result in immediate termination
>      ....
>      (8) Stealing.

Pl.'s Ex. 3; Thorp 2001 Employee Handbook.

According to Quigley as well as the remaining Thorp employees, Sommers,

Cranny and Heath, no one specifically replaced Newcomb upon her termination; rather,

her sales responsibilities were absorbed by remaining staff.  Def.'s Br. ¶ 54.

After receiving her Right to Sue notice from the EEOC, Newcomb filed a

Complaint in this court on December 2, 2003, alleging sex discrimination, in violation of

Title VII of the Civil Rights Act of 1964.  Thorp moved for summary judgment on November 2, 2004, and the motion has been fully briefed.

<u>Legal Analysis</u>

*Standard for Summary Judgment*

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment.  <u>Id</u>. at 322-23.  "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her."  <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir.1994) (citing  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-87 (1986);  <u>Celotex</u>, 477 U.S. at 322-24; <u>Anderson</u>, 477 U.S. at 249-52).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  <u>Waldridge</u>, 24 F.3d at 290.  Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant.  <u>Venters v. City of Delphi</u>, 123 F.3d 956, 962 (7th Cir. 1997).  If genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  <u>See  Shields Enters., Inc. v. First Chicago Corp.</u>, 975

F.2d 1290, 1294 (7th Cir.1992);  Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th

Cir.1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements

necessary to establish her case, summary judgment is not only appropriate, but mandated.

See Celotex, 477 U.S. at 322; Waldridge, 24 F.3d at 920.

 Because employment discrimination cases often turn on issues of intent and

credibility, we pay special attention when applying the summary judgment standard.  See

Senner v. Northcentral Technical College, 113 F.3d 750, 757 (7th Cir. 1997); Michas v.

Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).  To that end, we

carefully review affidavits and depositions for circumstantial proof which, if believed,

would show discrimination.  However, the Seventh Circuit has also made clear that

employment discrimination cases are not governed by a separate set of rules and remain

amenable to disposition by summary judgment so long as there is no *genuine* dispute as to

the material facts.  Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410

(7th Circ. 1997).

*Title VII Gender Discrimination*

 Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1);

Wyninger v. New Venture Gear, Inc.  361 F.3d 965, 978 (7th Cir. 2004).

 Newcomb alleges two instances of sex discrimination by Thorp.  First, her job

11

duties were twice restructured, in 2001 and more substantially in January 2003, primarily in an effort to appease disgruntled male colleagues and to ostracize her from the male sales force.  Second, she alleges that Thorp fired her in May 2003 solely because she is a woman.  Thorp defends against this claim by pointing to Newcomb's poor work performance as the motivation for reassigning her sales responsibilities and to her unauthorized removal of sales records as the reason for terminating her.

An employee alleging Title VII sex discrimination can proceed in one of two ways: (1) either directly, by presenting enough direct and/or circumstantial evidence to raise a genuine issue concerning the employer's motivation in carrying out the challenged employment action, or (2) indirectly, by utilizing the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting method.  Brill v. Lante Corp., 119 F.3d 1266 (7th Cir. 1997).

A word of caution about the direct method of proof:  the Seventh Circuit has acknowledged that remarks less obvious than an admission, *e.g.* "I won't hire you because you're a woman," may qualify as direct evidence so long as the statements or remarks "have some relationship with the employment decision in question" and amount to more than "inappropriate but isolated" workplace remarks.  Venters, 123 F.3d at 973.

Newcomb elects to proceed under the direct method of proof, but does not rely on conventional "direct evidence," which usually comes in the form of an acknowledgment

of discriminatory intent by the defendant.[6]   Instead, in her opposition to Thorp's motion

for summary judgment, she elects the "mosaic approach," as stated in Troupe v. May

Dept. Stores Co., 20 F.3d 734, 736 (7th Cir. 1994), where the Seventh Circuit allowed a

plaintiff utilizing the "direct method" to present a mosaic of circumstantial evidence to

create a triable issue of intentional discrimination.[7]

Newcomb justifies her invocation of the Troupe approach and her ignoring

Defendant's McDonnell-Douglas argument because "the facts in Newcomb's case are not

square pegs that neatly fit into the McDonnell Douglas framework because Defendant

employs a small sales staff, and as a salesperson, Newcomb had essentially only two

peers (Mr. Heath and Mr. Cranny)."  Pl.'s Opp'n Br. at 16.   In response, Defendant

admirably retooled its argument and framed its responsive pleading in Troupe terms, and

---

[6]See Miller v. Borden, Inc., 168 F.3d 308, 312 (7th Cir. 1999) (describing direct evidence as that which, if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption.  However, a statement or remark which stops short of an admission of illegality may suffice as direct evidence so long as the statements are 'causally related to the ... decision making process' or 'reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria'); see also Walker v. Glickman, 241 F.3d 884, 888 (7th Cir. 2001).

[7]Whether the direct/mosaic method of proof merges with the indirect, burden-shifting method is the subject of considerable discussion in the lower courts.  See Haywood v. Lucent Technologies, 169 F.Supp. 2d 890, 910, fn. 5 (noting the confusion among district courts concerning the third type of circumstantial evidence which invites the defendant to offer proof of a legitimate, non-discriminatory reason for the adverse employment action and shifts the burden to the plaintiff to prove the reason is a mere pretext for discrimination).  In addition, in Judge Rovner's discussion of subtle direct evidence, supra, she also invoked burden-shifting, explaining that once proof is raised that supports an inference that gender was at least a motivating factor in the adverse employment action, "[t]his in turn activates a burden on the part of the employer to demonstrate that it would have taken the same action against the plaintiff even if the proscribed criterion had played no role in its decision."  Venters, 123 F.3d at 973.

in this vein we, too, shall proceed.  Before we discuss the <u>Troupe</u> analysis, however, we must address the indirect method with respect to Newcomb's discriminatory termination claim.

<u>*McDonnell-Douglas*</u> *Test for Proving Gender Discrimination*

Newcomb has no direct evidence that her gender was the determining factor in her termination and must proceed, therefore, under the indirect method by first establishing a prima facie case of discrimination, then shifting the burden of production to the employer to present evidence of a legitimate, nondiscriminatory reason for its adverse employment actions, and finally rebutting the employer's stated reason as merely a pretext for covering up discriminatory conduct.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

To establish a prima facie case of gender discrimination, Newcomb must submit evidence that: (1) she was in the protected class; (2) she was meeting Thorp's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) at least one similarly-situated male employee was treated more favorably.  <u>Wyninger</u>, 361 F.3d at 978.

Newcomb fails to establish a prima facie case in several respects.  First, the deposition testimony indicates that the measuring errors she had been making on the job were of concern to Quigley, enough so that he had on one occasion suspended her for three days.  In addition, she, herself, drafted a clause for her 2002 sales contract that established a method for bringing costly measuring mistakes to her attention.  This is an

14

indication that she was not meeting her employer's legitimate performance expectations. On the other hand, there is an absence of documentary evidence to support that inference: no notes in her personnel file and no references to measuring errors in two of three sales agreements. Thus, drawing all inferences in favor of Newcomb, we cannot accept Defendant's assertion that she has failed to establish the second element of the prima facie case.

However, Newcomb's case founders on the fourth element: she cannot and has not demonstrated that a similarly-situated male colleague was treated more favorably in a comparable situation. First, there is no comparable instance of an employee being caught and disciplined for photocopying from the Journal and removing the information. Second, upon her termination, Thorp did not replace her with anyone at all, let alone a male. Newcomb's job duties were absorbed by the existing staff.

Had Newcomb mustered evidence to establish a prima facie case of discriminatory termination, her claim still would not satisfy her burden to rebut Thorp's preferred legitimate, non-discriminatory explanation of its adverse employment action. Under the McDonnell-Douglas burden-shifting approach, Thorp would be entitled to summary judgment, unless Newcomb can rebut its explanation for her termination with evidence that the explanation is pretextual. The Seventh Circuit has established that an employer's explanation can be foolish, trivial or even baseless, as long as it is honestly believed. Brill, 119 F.3d at 1270. There is no evidence adduced by Newcomb that Thorp's beliefs were not honestly held.

15

Newcomb has not established that what Thorp offers as a legitimate, non-discriminatory reason for her termination - copying and removing sales records from the Company's premises - is a pretext for discrimination. Whether or not Newcomb's actions on May 1, 2003, actually amounts to "theft" of confidential documents is not the question; the legal test for the defendant's employment action does not address whether it was a sound business judgment, only that the employer honestly believed the reason it was offered. See Brill, 119 F.3d at 1270 (7th Cir. 1997); McCoy v. WGN Continental Broadcasting Corp., 957 F.2d 638, 373 (7th Cir. 1992) (holding that the issue of pretext is not whether the employer has made a correct or desirable employment decision but whether it honestly believes in the reason it offers).

Quigley's explanation for being upset may have been muddled when he phoned Newcomb on May 2, 2003, but it is clear from his testimony that he believed a violation of workplace ethics had occurred and he felt it was sufficient to warrant termination. Newcomb argues that Thorp's reason for terminating her is a pretext for his unlawful discrimination because had he truly been concerned that she was passing information to competitors, he would have indicated to her why copying the sales book was such a serious problem when he contacted her on May 2. In addition, she argues that, despite his belief that she had taken records to provide to competitors, he "gave his approval" for a competitor to contact her after she terminated. Pl.'s Resp., PSMOF ¶ 34. We are not persuaded that these contentions demonstrate "pretext" under the Seventh Circuit's test.

Accordingly, under the McDonnell-Douglas framework Newcomb cannot succeed

16

in raising a genuine triable issue with regard to her claim that Thorp terminated her on the basis of her gender.

### The *Troupe* Method of Proving Gender Discrimination

Next, we examine Newcomb's allegations that the restructuring of her job was discriminatory. Under Troupe, a plaintiff may present three types of circumstantial evidence, each of which "is sufficient by itself (depending, of course, on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff" or which can be fit together to compose "a convincing mosaic of discrimination against the plaintiff." Troupe, 20 F.3d at 737. The first is evidence of suspicious timing, ambiguous statements, oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. The second type is evidence, whether or not rigorously statistical, that similarly-situated male employees received systematically better treatment. The third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a male colleague and that the employer's stated reason for disparate treatment is a mere pretext for discrimination. Id.

Judge Posner cautions defendants that regardless of the type of evidence presented, "[a]ll that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class," in this case a female. Id.

After a careful review of the record and drawing all inferences in Newcomb's

17

favor, we are not persuaded that Newcomb has established a genuine issue of material

fact concerning the reason for Defendant's adverse actions, using the <u>Troupe</u> direct

method of proof.

Plaintiff offers bits and pieces of circumstantial evidence to suggest that she was

the victim of gender discrimination, yet, when viewed as a whole and when challenged in

light of her burden to demonstrate that her employer's preferred reasons for taking

actions adverse to her are unworthy of belief, Newcomb fails to establish that, but for her

sex, she would not have had her job duties changed.

Newcomb's "mosaic" of evidence essentially depends on the exclusion of any

evidence of poor work performance and elevating the two comments by Quigley --

"Cantrell doesn't like to compete with women" and "your husband makes good money ....

the boys in the back are jumping at the bit for your job" -- to manifestations of her

employer's gender bias.

Assuming we adopt Newcomb's argument that the record indicates that

Newcomb's performance was not a factor in the decision to alter her responsibilities in

January 2003, Pl.s' Resp. at 17, the following remains unchallenged and unchanged with

respect to the 2001 job restructuring: (1) Newcomb was told she was being reassigned to

residential sales accounts because she was good at the residential side of the business; (2)

Cantrell was assigned to commercial sales; (3) when Newcomb protested that the job shift

was unfair, she was allegedly told: "Well, he [Cantrell] doesn't like to compete with a

woman." Pl.'s Resp. at 18-19.   The following events occurred in 2003: (1) Quigley

18

represented to Newcomb during their 2003 discussions that the change in her duties was necessary because of the company was having some financial difficulties; (2) he told her she was good retractable sales person and the job shift played to her strengths; (3) though he failed to refer to her poor work performance at this time, he later mentioned it as a justification for her termination; and (4) two months earlier, Quigley asked whether she was thinking of part-time work, now that her children were grown, and noted there were "guys in the back jumping at the bit" for her job.

We are hard-pressed to view the "Cantrell comment" as more than the sort of isolated, inappropriate workplace comment described in Venters, see supra. It does not reveal any propensity on the part of the decisionmaker, in this case Quigley, to evaluate employees based on illegal criteria. Id. at 973; see also, Hunt v. City of Markham, Ill. 219 F.3d 649, 652 (7th Cir. 2000) (determining that derogatory comments are not evidence of actionable discrimination when someone who is not involved in the employment decision of which the plaintiff complains expressed discriminatory feelings).

As for the November 2002 comments, they suffer from having little temporal connection to her job restructure in January 2003. First, they relate to a conversation about Newcomb's future that occurred five years earlier, when Newcomb was asked what she might do when her children were finished with school; in this light, it does not clearly manifest gender bias. Def.'s Br. at 19. Second, the statements were made two months prior to the employment action, which, under the applicable caselaw, does not establish sufficient temporal proximity to the job change. See Schuster v. Lucent Technologies,

Inc.  327 F.3d 569, 576 (7th Cir. 2003) (holding insufficient temporal proximity when Defendant's inquiry into Plaintiff's future employment plans was made some two years prior to Plaintiff's termination);  Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 724 (7th Cir.1998) (finding that a comment made five months prior to employee's termination was not temporally related to the discharge decision).  The statement that "there are guys in the back jumping at the bit to get your job" may strike Newcomb as subjectively biased, but on its face, it seems more likely to be a comment about eager and competitive co-workers, all of whom happen to be male, thus the reference to "guys."  See Mills v. First Federal Sav. & Loan Ass'n of Belvidere, 83 F.3d 833, 845 (7th Cir. 1996) (determining that remarks not objectively discriminatory may not be considered direct evidence of ... discrimination).  Finally, none of the "guys in the back" were ever given Newcomb's residential sales position; the duties were primarily taken on by the owner, Quigley, which can be viewed as consistent with the cost-cutting measures he stated that he was making.

Plaintiff's proffer of "mosaic" evidence simply does not permit a reasonable inference that Defendant's reasons for restructuring her job were pretextual.  The comments that allegedly demonstrate gender bias are insubstantial and fail to overcome the non-discriminatory reasons for the decision.  Thus, because Newcomb is unable to prove discrimination directly under the Troupe mosaic method of circumstantial evidence or indirectly under McDonnell Douglas, Thorp is entitled to summary judgment on Newcomb's gender discrimination claims.

20

<u>Conclusion</u>

For the reasons explicated above, we <u>GRANT</u> Thorp's Motion for Summary Judgment on Newcomb's claim that Thorp discriminated against her in the terms and conditions of her employment on the basis of her gender.  We also <u>GRANT</u> Thorp's Motion for Summary Judgment on the claim that gender served as the motivating factor in Newcomb's termination.


IT IS SO ORDERED.


Date: _____05/24/2005_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana


Copy to:

Jeffrey B. Halbert
HASKIN LAUTER LARUE & GIBBONS
jhalbert@hlllaw.com

Kenneth E. Lauter
HASKIN LAUTER LARUE & GIBBONS
klauter@hlllaw.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP
amcneil@boselaw.com

Sandra H. Perry
BOSE MCKINNEY & EVANS, LLP
sperry@boselaw.com